Entered on Docket Aug. 13, 2010

```
KAREN A. OVERSTREET
Chief Bankruptcy Judge
United States Courthouse
700 Stewart St., Suite 6310
206-370-5330
```

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| In re<br><br>PAULA M. ANDRUS,<br><br>        Debtor.<br>_____ | Chapter 13<br><br>Bankruptcy No. 09-13123 |
| HARVEY LeSURE,<br><br>        Plaintiff.<br>V.<br><br>PAULA M. ANDRUS,<br><br>        Defendant.<br>_____ | Adversary No. 09-01264<br><br><br>**MEMORANDUM DECISION**<br><br><br>**[NOT FOR PUBLICATION]** |

**I.  SUMMARY OF ACTION**

This is an action by plaintiff, Harvey LeSure, to force a sale and partition of real property title in his name and the name of debtor/defendant, Paula Andrus. The property is located at 10904 127th Pl. NE, Kirkland, WA (the "Property"). This matter came

Decision - 1

before the Court for trial on June 17, 2010, and closing argument on July 7, 2010.

## II. JURISDICTION

The Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1334(b) and this is a core proceeding under 28 U.S.C. § 157(b)(2)(B) and (O).

## III. FINDINGS OF FACT[1]

Defendant Paula Andrus purchased the Property in 1976. In or about 1997, Ms. Andrus met plaintiff Harvey LeSure and began a relationship. Plaintiff and defendant lived together in the Property from approximately 1997 to February 2007. During this time they shared living expenses. Ms. Andrus paid the mortgages, real property taxes and insurance on the Property and Mr. LeSure paid most of the other living expenses, including groceries, alcohol, cigarettes and energy bills.

On July 28, 1998, Ms. Andrus executed and acknowledged before a notary public a Quit Claim Deed granting to herself and Mr. LeSure as a "gift" all right, title and interest to the Property (the "Quit Claim Deed"). Ex. P-1. Mr. LeSure paid Ms. Andrus no consideration in connection with the transfer. A year and a half later, on February 28, 2000, Ms. Andrus recorded the Quit Claim Deed with the King County Recorder. Ex. P-1.

While the parties lived together the Property was encumbered by a first mortgage owed to Washington Mutual and a second mortgage owed to Key Bank. In May and June of 2004, the plaintiff made the

---

[1] Additional findings of fact that are pertinent to a particular conclusion of law are set forth under Section IV, Conclusions of Law.

Decision - 2

monthly payments to Washington Mutual for the first mortgage on the Property because Ms. Andrus was unable to make the payments. These payments totaled $1,248.56. Ex. P-3. In 2005. Mr. LeSure made an additional payment of $4,138 to Key Bank to cure a default and prevent a foreclosure by Key Bank. Ex. P-4, Ex. P-5.

In February 2007, the relationship between Ms. Andrus and Mr. LeSure ended and Ms. Andrus obtained a protective order preventing Mr. LeSure from returning to the premises. After Mr. LeSure left the Property, however, Ms. Andrus was not able to make the payments owing to Washington Mutual and Key Bank, resulting in the commencement of foreclosure proceedings by both lenders. Ms. Andrus also allowed multiple default judgments to be entered against her and against the Property by creditors for unpaid credit card debt and encumbered the Property by granting a deed of trust in the amount of $100,000 to the Livengood Fitzgerald and Alskog law firm on November 24, 2008. Ex. P-15, Ex. P-20.

In September 2008, Mr. LeSure filed an action to enjoin the lenders' foreclosure actions and a partition action as to the Property in King County Superior Court. Defendant removed that action to this Court on June 25, 2009. The primary issue in this case is whether the Property should be partitioned and sold and, if so, how the proceeds should be divided between the parties.

Mr. LeSure argues that the Court must judge the Quit Claim Deed on its face and must presume that Ms. Andrus intended to give half of the Property to him as a gift. Ms. Andrus argues that her intent must be judged in the context of an abusive relationship where she was pressured into signing the Quit Claim Deed. Ms. Andrus also argues that the Court must apply the committed

Decision - 3

intimate relationship doctrine[2] and find that the only just and equitable division of the Property is to award 100% to Ms. Andrus. Alternatively, Ms. Andrus contends that Mr. LeSure was in a confidential relationship with her and had undue influence over her when she signed the Quit Claim Deed, that Mr. LeSure fraudulently acquired the Quit Claim Deed by promising to marry her, and that Mr. LeSure holds his interest in the Property, if any, in a constructive trust for her.

For the following reasons, the Court will enter judgment in favor of Ms. Andrus.

## IV. CONCLUSIONS OF LAW

Based upon the foregoing findings of fact, the Court makes the following conclusions of law for purposes of Bankruptcy Rule 7052.

**A. Mr. LeSure's Interest in the Property as a Donee**

1. <u>The Intent of the Parties</u>.

A gift is the transfer of property with donative intent and without consideration. *Andrews v. Andrews*, 116 Wash. 513, 521, 199 P. 981 (1921). The parties dispute the intent of Ms. Andrus in signing the Quit Claim Deed. Ms. Andrus argues that she did not intend to give half of the Property to Mr. LeSure. Mr. LeSure argues that the Quit Claim Deed is evidence that Ms. Andrus intended to give half of the Property to him, citing *Marken v. Jacobs* for the presumption that a "deed evidences the true state of title and evidence to overcome it must be clear, cogent and

---

[2] In a pretrial motion in limine, Mr. LeSure moved to dismiss Ms. Andrus' claim for equitable division of the Property under the committed relationship doctrine (formerly the meretricious relationship doctrine). The Court denied the motion, finding that the pleadings provided adequate notice to plaintiff of this claim.

Decision - 4

convincing." 86 Wash. 504, 506, 150 P. 1161 (1915). Mr. LeSure argues that the Court must apply this presumption to the Quit Claim Deed and conclude that Ms. Andrus intended to give Mr. LeSure a one-half interest in the Property. The Quit Claim Deed, however, does not assign a percentage property interest to either of the parties.

In a rare display of consistent testimony, both parties testified that Ms. Andrus signed the Quit Claim Deed so that if something happened to her, Mr. LeSure would have a place to live. In all other respects, their testimony was completely at odds. Mr. LeSure testified that the Quit Claim Deed was not his idea and that he never asked Ms. Andrus for it. Ms. Andrus testified that Mr. LeSure promised to marry her and pressured her into drafting, signing and recording the Quit Claim Deed because once they were married, he would have a one-half interest in the Property in any case. Mr. LeSure testified that he never promised to marry Ms. Andrus. Ms. Andrus put a series of love notes into evidence, Ex. A-12, which she testified Mr. LeSure wrote and signed using affectionate nicknames. Mr. LeSure denied writing each of these notes, but provided no explanation for who wrote the notes. Ms. Andrus testified to numerous incidences where Mr. LeSure verbally and physically abused her and Mr. LeSure denied each and every such incident.

Considering all of the testimony, the Court finds that Mr. LeSure has little or no credibility. His testimony at trial contradicted his testimony at his pretrial deposition. His testimony on most of the issues was also contradicted by the physical evidence in the case. In particular, Mr. LeSure's

Decision - 5

testimony that he did not pressure Ms. Andrus into signing the Quit Claim Deed is not credible. The Court finds more credible the testimony of Ms. Andrus that she was pressured by Mr. LeSure into signing the Quit Claim Deed on the promise of marriage, and that she only intended the Quit Claim Deed to be effective in marriage. This conclusion is buttressed by the fact that the Quit Claim Deed did not simply transfer a one-half interest in the Property to Ms. LeSure; instead, it transferred the Property to both Ms. Andrus and Mr. LeSure, without any indication of their respective percentage interests in the Property. Thus, the Court finds no evidence of an intent by Ms. Andrus to gift a one-half interest in the Property to Mr. LeSure in the absence of a marriage.

2. <u>Undue Influence</u>.

As a general rule, a party seeking to set aside an inter vivos gift has the burden of showing the gift is invalid. *Lewis v. Estate of Lewis*, 45 Wash. App. 387, 388, 725 P.2d 644, 646 (1986). However, if the recipient of the gift is in a confidential relationship with the donor, the burden shifts to the recipient to prove that a gift was intended and that it was not the product of undue influence. *Lewis* at 388-89, 725 P.2d at 646; *White v. White*, 33 Wash. App. 364, 371, 655 P.2d 1173, 1176-77 (1982). A confidential relationship exists between two persons when one has gained the confidence of the other and purports to act or advise with the other's interest in mind. *McCutcheon v. Brownfield*, 2 Wash. App. 348, 357, 467 P.2d 868, 874 (1970)(quoting *Restatement of Restitution* § 166d (1937)). The existence of undue influence is a factual question. *McCutcheon v. Brownfield*, 2 Wash. App. 348, 356, 467 P.2d 868 (1970). The recipient must prove the absence of

Decision - 6

undue influence by clear, cogent, and convincing evidence. *Id.* at 356, 467 P.2d at 874. Evidence to sustain a gift between persons in a confidential relationship must show that the gift was made freely, voluntarily, and with a full understanding of the facts. *Id.* at 356, 467 P.2d at 874 (citing 38 Am.Jur.2d Gifts § 106 (1968)). Undue influence exists when one party unfairly persuades the other. *In re Infant Child Perry,* 31 Wash. App. 268, 272, 641 P.2d 178, 181 (1982). The Court must find undue influence if the result was produced by means that seriously impaired the free and competent exercise of judgment. *Id.* at 272, 641 P.2d at 181 (quoting Restatement (Second) of Contracts § 177, comment b (1981)). The Court must weigh factors such as the unfairness of the resulting bargain, the unavailability of independent advice, and the susceptibility of the person persuaded. *Id.* at 272, 641 P.2d at 181.

    The Court finds that a confidential relationship existed between Ms. Andrus and Mr. LeSure. It is clear that in the early stages of the relationship, Ms. Andrus trusted Mr. LeSure and he exerted great influence over her. She hoped they would be married. Their finances were intertwined. Ms. Andrus bought Mr. LeSure a ring at Mr. LeSure's request as an outward sign that they intended to be married. She believed him when he claimed that he needed to be added to the title on the Property to ensure he had a place to live if something happened to her. She felt pressured by him to comply with his demand to put the title in his name. She did not obtain independent advice regarding the wisdom of signing a Quit Claim Deed. She received no consideration other than anticipated love and affection. The evidence proves Ms. Andrus and Mr. LeSure

Decision - 7

were in a confidential relationship and that Ms. Andrus' position impaired her ability to exercise free and competent judgment.

Having concluded that the parties were in a confidential relationship, the burden is on Mr. LeSure to prove the absence of undue influence. This Court acknowledges that Ms. Andrus waited nearly one and a half years between signing the Quit Claim Deed and recording it with the King County Recorder. The Court is left with insufficient evidence, however, to infer any particular meaning from the delay. Neither party was able to persuade the Court that any inference should be drawn from the delay and the Court declines to draw any such inference. This Court finds that Mr. LeSure has not met his burden of proving the absence of undue influence, and it would be inequitable to allow him to benefit from the undue influence he had over Ms. Andrus. Consequently, the Court finds that the Quit Claim Deed was not effective to transfer a one-half interest in the Property to Mr. LeSure as a gift.

**B. The Committed Intimate Relationship Doctrine**

Having concluded that Ms. Andrus did not intend to make a gift of a one-half interest in the Property to Mr. LeSure, it is necessary to determine whether Ms. Andrus nevertheless intended to convert her separate Property into the equivalent of community property in a marriage. The recent Washington Supreme Court case of *Estate of Borghi v. Gilroy*, 167 Wash.2d 480, 219 P.3d 932 (2010) is instructive. In that case, the court analyzed prior Washington cases involving the character of separate and community property and clarified several important concepts. First, the court reaffirmed that the character of property as community or separate is established at acquisition. *Id.* at 484. Second, the court

Decision - 8

determined that no presumption as to the character of property owned by spouses arises from the names on the title. *Id.* at 490. "[T]he name on a deed or title does not determine the separate or community character of the property or even provide much evidence." *Id.* at 488. Finally, the court held that clear and convincing evidence is required to overcome the separate property presumption. *Id.* at 491. The foregoing principles apply generally to the case at hand if the parties were in a "committed intimate relationship."

A committed intimate relationship (formerly meretricious relationship) under Washington State law is a "stable marital-like relationship where both parties cohabit with knowledge that a lawful marriage between them does not exist." *Connell v. Francisco*, 127 Wash. 2d 339, 346, 898 P.2d 831 (1995). The committed intimate relationship ("CIR") doctrine is an equitable doctrine intended to allow the trial court to make an equitable distribution of the property accumulated by the couple during the relationship, thereby preventing unjust enrichment when the parties end their relationship. *Connell* at 349, 898 P.2d at 836.

The Washington Supreme Court directs a Court to use a three step process to apply the CIR doctrine. *Id.* at 349, 898 P.2d at 835-36. First, the Court must determine whether there is a CIR. If a CIR exists, the second and third steps are to evaluate the interest each party has in the property acquired during the relationship, and make a just and equitable distribution of the property. *Id.* at 349, 898 P.2d at 836.

Factors the court should consider in determining whether a CIR exists include continuous cohabitation, duration of the relationship, purpose of the relationship, pooling of resources and

Decision - 9

services for joint projects, and the intent of the parties. *Id.* at 346, 898 P.2d at 834 (citing *In re Marriage of Lindsey*, 101 Wash. 2d at 304-05, 678 P.2d 328 (1984)). "These characteristic factors are neither exclusive nor hypertechnical." *In re Marriage of Pennington*, 142 Wash. 2d 592, 602, 14 P.3d 764, 770 (2000).

The relationship between Mr. LeSure and Ms. Andrus was clearly a CIR. They cohabited for nine years, they pooled resources, and they lived together in a stable, marital-like way. Their intent was clearly to live together in a long-term relationship and support one another financially and emotionally.

A trial court is not permitted to redistribute property acquired by each party prior to the relationship at the termination of a CIR. Instead, the Court must limit its distribution of property to property that would have been characterized as community property had the parties been married. *Connell* at 350, 898 P.2d at 836. "Property ... acquired after marriage or after registration of a state registered domestic partnership by either domestic partner or either husband or wife or both, is community property." RCW 26.16.030. An asset is "separate property" if acquired before marriage, acquired during marriage by gift or inheritance, acquired during marriage with the traceable proceeds of separate property, or, in the case of earnings or accumulations, acquired during permanent separation. RCW 26.16.010.

Within a CIR there is a presumption that separate property remains separate property in the absence of sufficient evidence of the intent of the party owning the separate property to change its character from separate to community property. *Borghi*, *supra.* Separate property, however, may be changed into community property

Decision - 10

by a proper conveyance or agreement. *Volz v. Zang*, 113 Wash. 378, 383, 194 P. 409, 410 (1920); *In re Borghi*, 167 Wash. 2d 480, 489, 219 P.3d 932, 937 (2010). In *Borghi,* the court noted that a quit claim deed may be sufficient evidence of a spouse's intent to convert separate property into community property. 167 Wash. 2d at 485, 219 P.3d at 935.

    The Property was Ms. Andrus' separate property before the relationship commenced. This Court finds that Ms. Andrus signed the Quit Claim Deed because she thought she and Mr. LeSure were going to be married and she wanted to make the Property community property *as in marriage*. To the extent that she intended to make the Property anything other than her separate property, it was clearly her intent that the Property be community property and not a gift to Mr. LeSure as his separate property. The Court further concludes that Ms. Andrus' intent was to make the Property community property only in the event the parties were actually married. Finally, even if the Property was considered community property that could be equitably divided, for the following reasons, the Court concludes that Ms. Andrus is entitled to an award of the Property solely in her name.

    Mr. LeSure has steady employment earning $60,000 annually. Ms. Andrus earns approximately $34,000 per year. *See* Form B22C (Docket no. 12); Debtor's Schedule I (Docket no. 10). Ms. Andrus' financial problems have forced her into a bankruptcy proceeding; Mr. LeSure has not suffered the same fate. Mr. LeSure owns separate real property in Deer Park, Washington. Ms. Andrus has no real property other than the Property. Mr. LeSure and Ms. Andrus both benefitted from pooling resources during their relationship,

Decision - 11

but Ms. Andrus was not able to sustain her lifestyle and went further into debt after the relationship ended.

Mr. LeSure submitted a reconstructed check register showing payments he testified were made for household expenses between August 1998 and February 2007. Ex. P-7, Ex. P-8, Ex. P-9. Ms Andrus challenged some of the expenses in that reconstruction, arguing that they were solely for Mr. LeSure's benefit. Exhibit P-9 lists the expenses by payee name. The Court finds that of the expenses listed, $17,467.29 clearly fall into the category of community expenditures.[3] Giving Mr. LeSure the benefit of the doubt as to all the expenses listed in Exhibit P-9 brings the total expenses to $23,348.26. In addition, Mr. LeSure paid a total of $1,248.56 to Washington Mutual in 2004 for the first mortgage on the Property, and in 2005 he made a payment of $4,138 to Key Bank to cure a default and prevent a foreclosure by Key Bank. Ex. P-3, Ex. P-4, Ex. P-5. Thus, he contributed between $23,000 and $28,000 to the community expenses. Other than the three mortgage payments made by Mr. LeSure, Ms. Andrus paid all other payments due to both Washington Mutual and Key Bank. Ex. A-6, A-22, A-25. Although Ms. Andrus did not provide a total of all mortgage related payments she made, according to Ex. A-6, she paid a total of $51,756.96 just in interest to Washington Mutual and in real estate taxes during the term of the parties' relationship (1997-2007). Ms. Andrus also submitted an invoice for $8,816.50 for roof repair on the Property in 1999. Ex. A-7. Thus, her contributions to the community, not

---

[3] These expenses are evidenced by checks made payable to Paula Andrus, American Express, Cigarland, City of Kirkland, Costco, Fred Meyer, Owens Meats, Puget Sound Energy, Safeway, Savvy Salon, Schwann's, Shell, Texaco, Verizon, and Verizon Northwest.

Decision - 12

including principal payments on the mortgages, insurance payments, and incidental household expenses, totals $60,500.

The historical reconstruction of spending presented by the parties is less than perfectly clear or complete. From the reconstruction, however, the Court finds that Ms. Andrus contributed significantly more to the community than Mr. LeSure during their relationship, tipping the scales of equity in her favor.[4]

In light of all the foregoing factors, this Court finds that equity and fairness demand that 100% of the Property be awarded to Ms. Andrus. There is no clear evidence that she intended the Property to be treated as community property in the absence of a lawful marriage; and, even if the Property is treated as community property, the equities dictate that the Property be awarded to her.

**C. Alternative Theories**

Having found that Ms. Andrus did not convey a one-half interest in the Property to Mr. LeSure, it is not necessary for the Court to consider Ms. Andrus' alternative theories of constructive trust and fraudulent inducement.

**CONCLUSION**

For the foregoing reasons, the Court finds that plaintiff's action for partition of the Property should be dismissed and that the defendant is entitled to an order quieting title to the

---

[4] Each party called an expert to testify as to the current value of the Property. Neither expert testified, however, as to the value of the Property at the time the parties' relationship commenced, so the Court was unable to determine whether the Property increased or decreased in value during the relationship. The Court therefore determined that the valuation testimony was irrelevant to the issues to be resolved.

Decision - 13

Property in her sole name.  Counsel for the defendant may note for presentation a judgment consistent with this decision.

///End of Memorandum Decision///

*Karen A. Overstreet*
**United States Bankruptcy Judge**
(Dated as of Entered on Docket date above)

Decision - 14